### APPEAL OF MASSENGALE ADVERTISING AGENCY.

Docket No. 1496.    Submitted April 19, 1925.    Decided June 10, 1925.

On the evidence, *held*, that the taxpayer was a personal service corporation.

*E. Marvin Underwood, Esq.*, for the taxpayer.
*E. C. Lake, Esq.*, for the Commissioner.

Before STERNHAGEN, TRAMMELL, and PHILLIPS.

This appeal involves a deficiency in income and profits taxes for the year 1918 in the amount of $806.30 and is based upon the disallowance by the Commissioner of the taxpayer's claim for exemption as a personal service corporation under the Revenue Act of 1918.

#### FINDINGS OF FACT.

The taxpayer is a Georgia corporation with its principal office in Atlanta. It was organized in 1904 as the successor to the business formerly conducted from 1896 to 1904 by St. Elmo Massengale as an individual. The total capital stock of $20,000 consisted of 200 shares of the par value of $100 and was issued for the good will of the predecessor business. No additional capital was paid in.

During 1918 the stockholders and the amount of stock owned by each were as follows:

|  | Shares. |
| --- | --- |
| St. Elmo Massengale | 198 |
| W. R. Massengale (brother of St. Elmo Massengale) | 1 |
| Elizabeth S. Massengale (wife of St. Elmo Massengale) | 1 |

The officers were: President and treasurer, St. Elmo Massengale; secretary, W.R. Massengale; vice president, Elizabeth Massengale.

The taxpayer conducted an advertising agency and did business during the year involved in this appeal in the following manner:

St. Elmo Massengale would usually go to prospective advertisers and solicit their business. Occasionally W. R. Massengale would do this. Sometimes an advertiser would approach St. Elmo Massengale and ask his opinion as to the best and most advantageous method of advertising and developing its product. When desired, Massengale would prepare cuts or drawings and also drafts of advertising matter, make a print and offer suggestions as to the best medium or mediums of advertising and give a statement of the costs thereof. The customer, if he approved, would designate the medium or mediums desired. For this service the taxpayer received an amount slightly in excess of its cost.

The taxpayer had a small printing plant and other facilities for the purpose of making up copies, drawings, cuts, etc., which appears on the balance sheet included with furniture and fixtures at $2,845.96 for 1918. Two or three artists were employed for the purpose of making drawings, some of which had been roughly sketched by Massengale.

When the newspapers, billposters, or other mediums of advertising were agreed upon, the taxpayer would send to the publisher, street car company, or billposter company, as the case might be, the copy and cuts or drawings agreed on for the number of insertions desired. An order was sent in by the taxpayer in each particular case in the name and behalf of each advertiser. The taxpayer acted in the capacity of agent. The publisher, or other advertising medium, paid the taxpayer a commission on the business sent in. The rate for space for each advertiser was governed by the amount of space contracted for by him. If a large amount of advertising was contracted for, a better rate was secured than if a smaller amount was agreed upon.

The publishers, as a rule, sent the bills for advertising to the taxpayer, but the advertisement of each advertiser was covered by a separate bill. Some bills, however, were sent by the publishers direct to the advertisers and did not go through the hands of the taxpayer. The taxpayer sent out bills which called for payment a few days before payment was due to the newspapers or other mediums. It would separate the bills for the publishers, check up the amount of space used and see that the advertisements were in accordance with the contracts and the copies, and would then remit to the publishers the amounts received from the different advertisers less the commissions. The taxpayer did not, in any case, purchase space in newspapers or other advertising mediums in gross and sell to advertisers. It did not by agreement obligate itself to assume liability for any loss in case advertisers failed to pay their bills, but in order to hold the good will of the publisher or billposters and add to its reputation it, as a rule, paid debts of customers who did

not pay or who were slow in paying. During 1918, on gross business in excess of $326,000, the taxpayer lost about $1,300 in this way. It did not mention to the publishers, as a rule, the fact that certain advertisers had failed to pay their bills and it took the loss instead of taking up the matter with the publishers or bill-posters and insisting that they take care of any loss. In several instances such losses were not made good by the taxpayer but were suffered by the publishers. The publishers could have collected their bills direct without the medium of the taxpayer. In any event, the taxpayer was not responsible for any space not taken or used by any advertiser and it suffered no loss on that account except to the extent that any commission it would have received on account of the advertising was affected. If the advertiser did not pay the publisher his advertisement stopped running in that particular paper.

The taxpayer did not employ a solicitor and all business was done through the personal services of St. Elmo Massengale and W. R. Massengale. The business was secured largely on account of the personality and experience of these two men and their acquaintance with the advertising public and advertising mediums. The taxpayer acted and procured space for customers upon a letter received from the particular advertiser or upon a personal request.

The balance sheets of the taxpayer of December 31, 1917, and December 31, 1918, are as follows:

### ASSETS.

| | | 1917. | 1918. |
|---|---|---|---|
| Cash | | $1,000.96 | $11,556.87 |
| Trade accounts and notes receivable | | 19,462.63 | 17,795.43 |
| Personal accounts receivable | | 10,106.53 | 1,474.84 |
| Investments: | | | |
| Liberty loan bonds | $300.00 | | $6,600.00 |
| Other bonds and stocks | 48,075.00 | | 1,000.00 |
| Real estate | 7,100.00 | | 100.00 |
| Life insurance | 5,070.00 | | 5,106.00 |
| Total investments | | 60,545.00 | 12,806.00 |
| Fixed assets: | | | |
| Automobile | | 3,211.50 | 2,141.00 |
| Furniture and fixtures and printing press | | 2,551.46 | 2,845.96 |
| Prepaid license | | | 50.00 |
| Total | | 96,878.08 | 48,670.10 |

### LIABILITIES.

| | 1917. | 1918. |
|---|---|---|
| Notes payable | $18,552.59 | $1,000.00 |
| Accounts payable, advertising | 20,031.78 | 30,034.99 |
| Accounts payable, members | 5,000.00 | |
| St. Elmo Massengale stock borrowed | 45,000.00 | |
| Capital stock | 20,000.00 | 20,000.00 |
| Profit and loss (minus) | 11,706.29 | 2,364.89 |
| | 96,878.08 | 48,670.10 |

The amount of $19,462.63, appearing on the balance sheet of December 31, 1917, under the heading "trade accounts and notes receivable," represented amounts billed to clients which had not been collected at the end of that year. Only a small portion thereof was due. On December 31, 1918, the same item appeared in the amount of $17,795.43. The total amount of credit extended during the year was $4,721.26.

The item " personal accounts receivable," appearing on the balance sheet at the close of 1917 in the amount of $10,106.53, represented salary drawn in advance by W. R. Massengale who worked on a salary basis. The amount of $1,474.84, shown on the balance sheet at December 31, 1918, also represented advances to officers.

The $6,600 of Liberty bonds, appearing on the balance sheet for 1918, were purchased during 1918. during one of the loan campaigns and were not used in the business. The only borrowing of money from banks during 1918 was a $4,000 loan which was paid back within 30 days. The item of notes payable in the amount of $1,000 on the 1918 balance sheet as a liability was not explained further than by the statement that the taxpayer did not borrow any money for its business except the amount of $4,000 for the period stated.

The item " other bonds and stocks " $48,075, was mainly a personal matter of Massengale, mistakenly included as a company affair by the auditor in compiling the 1917 balance sheet, and later, on discovery of the error in 1918, it was removed from the company accounts together with the offsetting liabilities. It was not used in the taxpayer's business.

The item of $1,000 of stocks and bonds, appearing on the balance sheet, was stock in the Ashard Park Corporation which was organized to install and equip a canteen at Camp Gordon for the soldiers. The taxpayer borrowed the money to buy this stock. It was not actually used in the business of the taxpayer. The $1,000 item was retained in the 1918 balance sheet. It represented an investment by the taxpayer but it had no relation to its business.

The " life insurance " asset represented the cash surrender value of policies taken out by the company on the lives of officers.

The item shown as accounts payable, in the amount of $20,031.78, was accounts payable by customers to newspapers and other advertising media which had not been paid at the end of the year and had not then become due but which had been billed to the customers. The taxpayer paid cash for everything that it recieved during the year and did not borrow any money except the amount of $4,000 for a 30-day period.

No explanation was given as to the item "members $5,000," appearing among the 1917 liabilities. The item "real estate $7,100,"

appearing as an asset in the 1917 balance sheet, related to land in Pensacola, Fla., taken from a customer in payment of an account. In 1918 Massengale acquired it from the taxpayer. The item "automobile" represented an automobile that was in continuous use for business purposes.

Capital invested or borrowed was not a material income-producing factor during the taxable year.

### DECISION.

The deficiency determined by the Commissioner is disallowed.